**CONTINUATION OF APPLICATION FOR SEARCH WARRANT**

I, Todd Wilton, being duly sworn, hereby depose and state as follows:

**INTRODUCTION**

1.      I am a Special Agent (SA) with the Department of Homeland Security (DHS), Homeland Security Investigations (HSI), assigned to HSI Sault Ste. Marie, Michigan, hereinafter referred to as HSI Sault Ste. Marie, and have been so employed since October of 2008.  As part of my duties as an HSI SA, I investigate criminal violations relating to child exploitation and child pornography including violations pertaining to the illegal production, distribution, receipt, and possession of child pornography, in violation of 18 U.S.C. §§ 2251(a) and 2252A.  I have received training in the area of child pornography and child exploitation, and I have had the opportunity to observe and review numerous examples of child pornography (as defined in 18 U.S.C. § 2256(8)) in many forms of media, including computer media.  In connection with such investigations, I have served as case agent, have been the affiant of several search warrants and complaints, conducted interviews of defendants and witnesses, and have served as an undercover agent in online child exploitation cases. I have attended specialized courses involving child exploitation and covert online chatting. I have participated in numerous investigations involving human trafficking, child exploitation, online child enticement, and child pornography.

2.      I make this continuation in support of an application for a search warrant for information associated with the Snapchat Username/User IDS: **lukeman0923, lukeman0615, jstadd25, lukeman061524, brothaaa251587,** and **addme202627** (The "SUBJECT ACCOUNTS") stored at premises, owned, maintained, controlled, or operated by Snap, Inc. ("Snap"), a social networking company headquartered in Santa Monica, California. The information to be searched is described in the following paragraphs and in Attachment A.

**3.**     This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Snap to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B, related to Snapchat account for the SUBJECT ACCOUNTS. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

**4.**     This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. The information contained in this affidavit is based on information directly furnished to your affiant and information from other law enforcement, to include the Grand Traverse County Sheriff's Office.

**5.**     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. §§ 2251(a) (including the production, distribution, and possession of child pornography) have been committed by the user of the SUBJECT ACCOUNTS. There is also probable cause to search the information described in Attachment A for evidence, contraband, and/or fruits of these crimes further described in Attachment B.

**JURISDICTION**

**6.**     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a District Court of the United States that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

**PERTINENT STATUTES**

**7.**     This investigation concerns violations of 18 U.S.C. §§ 2251 and 2252A.

**a.**      Section 2251(a) prohibits, among other things, employing, using, persuading, inducing, enticing, or coercing any minor to engage in any sexually explicit conduct for the purpose of producing any visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct.

**b.**      Section 2252A(a)(2) prohibits knowingly receiving or distributing any child pornography that has been mailed, or using any means or facility or interstate commerce, shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

**c.**      Section 2252A(a)(5)(B) forbids, among other things, possessing child pornography that was transported using a means or facility of interstate or foreign commerce, including the internet, or that was produced using materials that were mailed, shipped, or transported in or affecting interstate or foreign commerce by any means, including by computer.

**8.**      The legal authority for this search warrant application is derived from Title 18, United States Code, chapter 121, §§ 2701-11, entitled "Stored Wire and Electronic Communications and Transactional Records Access."   18 U.S.C. § 2703(c)(A) allows for nationwide service of process of search warrants for the contents of electronic communications.   Pursuant to 18 U.S.C. § 2703, as amended by the USA PATRIOT Act, Section 220, a government entity may require a provider of an electronic communication service or a remote computing service to disclose a record or other information pertaining to a subscriber or customer of such service pursuant to a warrant issued using procedures described in the Federal Rules of Criminal Procedure by a court with jurisdiction over the offense under investigation.   18 U.S.C. § 2510(12) defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in

whole or in part by a wire, radio, electromagnetic, photo-electronic or photo optical system that affects interstate or foreign commerce," with certain exceptions not applicable here.  18 U.S.C. § 2510(17) defines "electronic storage" as "any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof," and "any storage of such communication by an electronic communication service for purposes of backup protection of such communication."

## BACKGROUND ON SNAPCHAT

9.      Snap, Inc. ("Snap") the owner of Snapchat, is a United States company and a provider of an electronic communications service as defined by 18 U.S.C. §§ 3127(1) and 2510.  Specifically, Snapchat is a free-access social networking service, accessible through its website and its mobile application, that allows subscribers to acquire and use Snapchat accounts like the target account(s) listed in Attachment A, through which users can share messages, multimedia, and other information with other Snapchat users.

10.     Snap collects basic contact and personal identifying information from users during the Snapchat registration process. Snap also collects whether the account phone number has been verified.

11.     Snap also collects and retains information about how each user accesses and uses Snapchat. This includes information about the Internet Protocol ("IP") addresses used to create and use an account, unique identifiers and other information about devices and web browsers used to access an account, and session times and durations. Snap also collects account change history, which Snap describes as a log of changes in registration email or phone number, birthdate, and display name. Each Snapchat account is identified by a username.

12.     Snapchat offers four primary ways for users to communicate with each other.

a.      **Snaps**. A user takes a photo or video using their camera phone in real-time. The user then selects a time limit of 1-10 seconds for the receiver to view the photo or video. A user can elect to have the photo/video saved in their phone's photo gallery or just sent via Snapchat, without being saved.  The photo/video can then be sent to a friend on Snapchat. The snap is deleted after the selected amount of time. If a recipient attempts to take a screenshot of the snap to save on his/her phone, the application will notify the sender of this behavior. Snapchat states that it deletes each snap from its servers once all recipients have viewed it.  If a snap has not been viewed by all recipients, Snapchat states that it retains the unopened snap for thirty days to a direct recipient and twenty-four hours for group chats.

b.      **Memories**. Memories are Snapchat's cloud-storage service.  Users can save their sent or unsent Snaps, posted Stories, and photos and videos from their phone's photo gallery in Memories. A user can also edit and send Snaps and create Stories from these Memories. Snaps, Stories, and other photos and videos saved in Memories are backed up by Snapchat and may remain in Memories until deleted by the user. Users may encrypt their content in Memories (called "My Eyes Only"), in which case the content is not accessible to Snap and cannot be decrypted by Snap.

c.      **Stories**. A user can also add the photo/video Snap to their "Story." Depending on the user's privacy settings, the photos and videos added to a Story can be viewed by either all users of Snapchat or just the user's friends for up to 24 hours. Stories can also be saved in Memories.

d.      **Chat**. A user can also type messages to friends within the Snapchat app using the Chat feature. A user sends a Chat message to a friend, and once it is viewed by both parties – and both parties swipe away from the Chat screen – the message will be cleared. Within the Snapchat app itself, a user can opt to save part of the Chat by tapping on the message (text or photo) that he or she wants to keep. The user can clear the message by tapping it again.

13.    Snapchat also obtains a variety of non-content information from its users, such as:

a.      **Usage Information**. Snapchat may collect information about how users interact with its services, including which search queries they submit, and how they communicate with other users, including maintaining a log of all snaps to and from an account for the last 31 days, for 24 hours of posted Stories, and for any unopened Chats or those saved by a sender or recipient, and how a user interacts with these messages (such as when a user opens a message).

b.      **Device Information**. Snapchat collects information about the devices of its users, including information about the user's hardware and software, such as the hardware model, operating system version, device memory, advertising identifiers, unique application identifiers, apps installed, unique device identifiers, browser type, language, battery level, and time zone; information from device sensors, such as accelerometers, gyroscopes, compasses, microphones, and whether the user has headphones connected; and information about the user's wireless and mobile network connections, such as mobile phone number, service provider, and signal strength. Snapchat can also provide the version of the application that is being used,

the "last active" date the application was used, and whether two-factor-authentication is enabled.

c.    **Device Phonebook**. Snapchat may collect information about the phonebook of the user's device.

d.    **Cameras and Photos**. Snapchat may collect images and other information from the user's device's camera and photos.

e.    **Location Information**. Snapchat may collect information about the user's location, including precise location using methods that include GPS, wireless networks, cell towers, Wi-Fi access points, and other device sensors, such as gyroscopes, accelerometers, and compasses.

f.    **Snap Map**. Snapchat allows a user to share location information with his/her friends and also obtain location information about the user's friends. Based on such information, Snapchat places the friends' locations on a map viewable to the user. Snapchat can provide whether Snap Map was enabled.

g.    **Information Collected by Cookies and Other Technologies**. Snapchat may collect information through cookies and other technologies about the user's activity, browser, and device.

h.    **Log Information**. Snapchat collects log information when a user uses Snapchat's website, including device information, access times, pages viewed, IP address, and pages visited.

14.    In my training and experience, evidence of who was using the above-listed usernames and from where, and evidence related to the subject offense, may be found in the files and records described above.  This evidence may establish the "who, what, why, when, where, and how" of

the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

15.     The stored communications and files connected to a Snapchat account may provide direct evidence of the offenses under investigation. Based on my training and experience, instant messages, emails, voicemails, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.  In fact, evidence is included in this continuation detailing the use of Snapchat by the SUBJECT ACCOUNTS to commit child exploitation offenses, including possession of child pornography.

16.     In addition, the user's account activity, logs, stored electronic communications, and other data retained by Snap can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

17.     Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to

commit a crime), or consciousness of guilt (e.g., deleting account information to conceal evidence from law enforcement).

18.     Therefore, Snap's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Snapchat.  In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## PROBABLE CAUSE

19.     On November 14, 2025, the Grand Traverse County Sheriff's Office (GTCSO), Traverse City, Michigan received a complaint concerning a pregnant 13-year-old minor victim (hereinafter referred to as MV-1) in Traverse City, Michigan. Detectives, assigned to the GTCSO, contacted MV-1's mother who stated that the father of the unborn baby is possibly someone named "Lucas." MV-1's mother stated that she has never met "Lucas." MV-1's father voluntarily relinquished MV-1's cellular telephone to the GTCSO and provided written consent for forensic analysis. The analysis led to the discovery of electronic communications between an adult suspect from New York, identified as Lucas POBUTKIEWICZ[1], and MV-1. In addition, the analysis and subsequent forensic interviews of MV-1 determined that POBUTKIEWICZ knew MV-1 was 13, traveled to Traverse City, Michigan on October 24, 2025, for one night, transported MV-1 to an identified hotel and engaged her in criminal sexual conduct on multiple occasions. POBUTKIEWICZ video-recorded himself with MV-1's cellular telephone sexually penetrating MV-1 on one occasion. Afterwards, he had her send the video to his cellular telephone via Snapchat or SMS message.

**Videos and Images from MV-1's Phone**

---

[1] Agent Note: Pobutkiewicz was identified using his address and Secretary of State picture and information.

20.    The GTCSO conducted a forensic analysis of MV-1's cellular telephone, which is a Samsung S911U. It was manufactured outside of the State of Michigan.

21.    The GTCSO discovered the following images and video on MV-1's cellular telephone:

a.    This image is titled "Snapchat-1200066605.jpg" and was produced on October 24, 2025. This image depicts POBUTKIEWICZ1 and MV-1 from the areas of their stomachs upward and facing the camera. MV-1 and the male appear nude, and she is leaning against him. POBUTKIEWICZ's left hand is placed upon MV-1's right breast. The image depicts POBUTKIEWICZ with a beard and tattoos on his chest and left arm.

b.    This video is titled "20251025_104832.mp4" and is 37 seconds in length. This video was produced on October 25, 2025. This video depicts MV-1 from behind wearing only a pink and black leopard print tank-top style shirt. MV-1 is leaning on her left elbow, right hand and her knees backwards upon a gray colored chair thus exposing her buttocks and anus. An adult Caucasian male2 is depicted from his stomach downward wearing a gray colored long sleeved shirt pulled upward above his stomach and what appears to be pants and underwear pulled downward around his ankles thus exposing his erect penis is standing behind MV-1 and engaging her in vaginal intercourse. During the video, the male pulls MV-1's head backwards via her hair with his left hand and simultaneously exposes her face to the camera. The adult male appears to have produced this video.

c.    This image is titled "Screenshot_20251101_204235_Snapchat.jpg" and was produced on November 2, 2025. This image depicts POBUTKIEWICZ from

10

his chest upward and facing the camera. POBUTKIEWICZ is wearing a black long-sleeved shirt.

    **d.**    This image is titled "Screenshot_20251109_082951_ChatGPT.jpg" and was produced on November 9, 2025. This image depicts two pink and white colored pregnancy tests that indicate positive responses.

**Snapchat Communications**

**22.**    The GTCSO discovered additional communications from the forensic analysis of MV-1's telephone via Snapchat. These communications are electronic messages between MV-1's account and the SUBJECT ACCOUNT "lukeman0923."  The GTCSO preserved the content of these accounts on November 14, 2025.  A sampling of the communications from November 13-14, 2025 is as follows:

    **a.**    "lukeman0923" – "Did your mom make a Snapchat," "I think your mom popped up on my quick add feed" and "It says "in my contacts" and her name is "mama."

    **b.**    MV-1 – "Oh fuck," "Block her," "She has a old one" and "That she doesn't use"

    **c.**    "lukeman0923" - "I'm getting off the game and gonna go to bed. I love you baby and goodnight"

    **d.**    MV-1 – "I love you my love sweet dreams," "I miss you," "I just wanna be on call," "I love you so much sweet boy" and "I love you dear"

**23.**    On November 17, 2025, MV-1 was forensically interviewed at the Traverse Bay Children's Advocacy Center, 2000 Chartwell Drive, Suite #3, Traverse City, Michigan. MV-1 made the following statements in sum, but not verbatim:

     **a.**     That she identified the adult male depicted in the image titled "Snapchat-1200066605.jpg" as previously described in paragraph 22a of this affidavit as "Lucas."

     **b.**     That "Lucas" met her via her former boyfriend on Snapchat.

     **c.**     That she told "Lucas" that she was 13 years of age via Snapchat.

     **d.**     The GTCSO discovered that on October 24 and 25, 2025, two telephone calls were made between MV-1's and POBUTKIEWICZ's telephone numbers and that MV-1's cellular telephone was geolocated at the Parkshore Resort, 1401 US 31 North, Traverse City, Michigan.

24.     On November 17, 2025, the GTCSO visited the Parkshore Resort and confirmed that POBUTKIEWICZ reserved a room on October 22, 2025, with a check-in date of October 24, 2025 and a check-out date of October 25, 2025. The resort confirmed that POBUTKIEWICZ stayed in room #327, provided a copy of the invoice for the lease of the room and video surveillance video dated October 24, 2025 at 2:07:16 (EST) that depicts POBUTKIEWICZ at the front desk of the resort upon checking into his room. The receipt indicates the following information: "Lucas POBUTKIEWICZ"

     **a.**     Email: lukeman987@icloud.com

     **b.**     Street Address: "4251 Stepping Stone"

     **c.**     Province/State: New York

     **d.**     Postal/Zip Code: "130904"

25.     The GTCSO visited room #327 and determined that the furniture appears the same as the furniture depicted in the background of the image titled "Snapchat-1200066605.jpg" as previously described in paragraph 22a of this affidavit. The resort identified POBUTKIEWICZ's vehicle as

a black Chevrolet Silverado pickup truck bearing New York registration number "KZC5425." The GTCSO verified that this vehicle is registered to POBUTKIEWICZ.

26.   On February 12, 2025, I travelled to New York and was part of the team that arrested POBUTKIEWICZ on an arrest warrant signed by Magistrate Judge Sally Berens. POBUTKIEWICZ spoke to myself and another agent, post Miranda. He said the following:

   a.   POBUTKIEWICZ confirmed he travelled from New York to Michigan to meet MV-1;

   b.   POBUTKIEWICZ met with MV-1 and picked her up outside of her school (middle school);

   c.   POBUTKIEWICZ took MV-1 to the hotel and there he engaged her in sexual intercourse, once on October 24 and once on October 25;

   d.   POBUTKIEWICZ and MV-1 both recorded the sexual contact on their phones;

   e.   POBUTKIEWICZ dropped MV-1 off at a mall and drove back to New York; and

   f.   POBUTKIEWICZ spoke to your affiant and another agent about multiple other minors he had had sexual contact with.

27.   On February 12, 2026, multiple devices were seized as part of POBUTKIEWICZ's arrest. During a review of those devices over the subsequent months, agents discovered that POBUTKIEWICZ was messaging dozens of minors from dozens of separate snapchat accounts. Upon further review of his and MV-1's phones, agents were able to see the following accounts communicating with individuals who identified themselves or were suspected as being under the

13

age of 18. The accounts are listed below, along with a description of sexually explicit communications associated with each account:

    a.    "lukeman0615"

        i.    For example, between the dates of November 12, 2024 and July 17, 2025, lukeman0615 had a conversation with username "sillygo0se0099," a suspected minor. In the conversation, POBUTKIEWICZ indicated the two had been in a relationship for seven months, with approximately 68 images being exchanged in the course of the conversation; however, the content of the images could not be reviewed.

    b.    "jstadd25"

        i.    For example, on or about February 9, 2026, jstadd25 had a conversation with username "julietteacosta3," a minor who purported to be 12 years of age. In the conversation, the two discussed POBUTKIEWICZ having witnessed the minor victim masturbating on a prior date. POBUTKIEWICZ claimed to be in possession of digital evidence of this act, and POBUTKIEWICZ indicated he could sextort the minor victim by distributing the video of her masturbating.

    c.    "lukeman061524"

        i.    For example, on or about September 11, 2025, lukeman061524 had a conversation with username "lilypfender2024," a minor who purported to be 10 years of age. In the conversation, the two discussed masturbation, with POBUTKIEWICZ encouraging the minor victim to

engage in bestiality with her dog, specifically requesting cunnilingus. POBUTKIEWICZ then attempted to sextort the minor victim.

d.   "brothaaa251587"

   i.   For example, on or about December 15, 2025, "brothaaa251587" had a conversation with username "maelee20255783," a suspected minor who appeared to be between the age of 14 to 16. In the conversation, the two discussed masturbation, with POBUTKIEWICZ requesting photos of the suspected minor masturbating, which she sent to POBUTKIEWICZ.

e.   "lukeman0923"

   i.   For example, between the dates of November 13 and 14, 2025, "lukeman0923" had a conversation with MV-1. In the conversation, the two indicated that they were in a romantic relationship.

f.   "addme202627"

   i.   For example, between the dates of January 3, 2026 and January 7, 2026, "addme202627" had a conversation with MV-1. In the conversation, the two discussed MV-1 sharing masturbation content of herself with other individuals. MV-1 sent an image and video of her masturbating to POBUTKIEWICZ in the chat.

28.   After POBUTKIEWICZ was interviewed, the Hon. Sally J. Berens authorized a warrant to search one of POBUTKIEWICZ's Snapchat accounts, specifically, the account associated with username "lukeman0923." Attachment A for this warrant identified the account as "lukeman0923-lucas." On March 4, 2026, Snapchat returned the warrant sent and indicated that the warrant was not serviceable because of the inclusion of the suffix "-lucas" in the description of the username.

15

## CHARACTERISTICS OF CHILD PORNOGRAPHERS

29.     From my own observation and experience, as well as conversation with other experienced investigators, I have learned the following regarding child pornography offenders.

30.     The majority of individuals who collect child pornography are persons who have a sexual attraction to children. They receive sexual gratification and satisfaction from sexual fantasies fueled by depictions of children that are sexual in nature.

31.     The majority of individuals who collect child pornography collect sexually explicit materials, which may consist of photographs, magazines, motion pictures, video tapes, books, slides, computer graphics or digital or other images for their own sexual gratification. The majority of these individuals also collect child erotica, which may consist of images or texts that do not rise to the level of child pornography, but which nonetheless fuel their deviant sexual fantasies involving children. In this case, it is likely the SUBJECT ACCOUNTS will contain additional child pornography and sexually explicit materials.

32.     The majority of individuals who collect child pornography often seek out like-minded individuals, either in person or on the Internet, to share information and trade depictions of child pornography and child erotica as a means of gaining status, trust, acceptance and support. This contact also helps these individuals to rationalize and validate their deviant sexual interest and associated behavior. The different Internet-based mediums used by such individuals to communicate with each other include, but are not limited to, P2P, e-mail, e-mail groups, bulletin boards, IRC, newsgroups, instant messaging, and other similar vehicles. Frequently, multiple mediums will be used.

33.     The majority of individuals who collect child pornography often collect, read, copy or maintain names, addresses (including e-mail addresses), phone numbers, or lists of persons who

16

have advertised or otherwise made known in publications and on the Internet that they have similar sexual interests. These contacts are maintained as a means of personal referral, exchange, or commercial profit. This is particularly true where, as here, the individuals are in contact with other like-minded offenders. In this case, it is likely the SUBJECT ACCOUNTS will contain additional evidence of these contacts, including identifiers for the individuals or groups with whom the SUBJECT ACCOUNTS were involved.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

34.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A), by using the warrant to require Snapchat, Inc to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## REQUEST FOR NON-DISCLOSURE ORDER

35.     I am also advised by the U.S. Attorney's Office that the notice requirement of Fed. R. Crim. P. 41(f)(1)(C) applies to the service provider, not to the subscriber or customer of the service, pursuant to 18 U.S.C. § 2703(b)(A).  *See United States v. Bansal*, 663 F.3d 634, 662-63 (3d Cir. 2011). Finally, although the Government is not required to provide notice to the subscriber or customer, I am aware that Snapchat, Inc, as a matter of business policy, may or may not notify subscribers of the receipt of legal process unless ordered by a court not to do so. The U.S. Attorney's Office has advised me that 18 U.S.C. § 2705(b) provides authority for the Court to command the recipient of a warrant or other order issued under Section 2703 not to notify any other person of the existence of such warrant or order if the Court finds reason to believe that such

17

notice would result in danger to a person's life or safety, flight from prosecution, destruction of evidence, witness intimidation, or other serious jeopardy to an investigation. I request that the Court order Snapchat, Inc not to disclose the existence of this warrant because making POBUTKIEWICZ aware that they are the subject of an ongoing criminal investigation would likely cause them to destroy or hide evidence. Although Section 2705(b) does not set a time limit for the duration of a non-disclosure order, I submit that a period of **180 days**, subject to extension upon a showing of need by the Government, would be reasonable.

36.     Because the warrant will be served on Snapchat, Inc, which will then compile the requested records at a time convenient to them and outside the presence of a federal law-enforcement officer, there is good cause to authorize execution of the requested warrant at any time of the day or night.

## CONCLUSION

37.     Based on my training and experience, and the facts as set forth in this affidavit, there is probable cause to believe that on the computer systems in control of Snapchat, Inc exists evidence of a crime, contraband and/or fruits of a crime. Based on the aforementioned information, I respectfully submit that there is probable cause to believe that the Snapchat, Inc account described in Attachment A will contain evidence of a crime, specifically but not limited to, identification of the person who possessed and/or distributed files of child pornography through the Snapchat, Inc account discussed above. Accordingly, a search warrant is requested.

38.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711(3) and 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that - has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(I).

18

**39.**     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.  Because the warrant will be served on Snapchat, Inc, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.